## Dant & Russell Sales Co. *v.* Washington Lumber & Millwork Co., Appellant.

Argued April 16, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Isadore Gottlieb,* for appellant.

*Frederick A. Van Denbergh, Jr.,* with him *Philip M. Hammett* and *Saul, Ewing, Remick & Saul,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 26, 1952:

On September 14, 1950, the plaintiff Dant & Russell Sales Co., accepted from the defendant Washington Lumber & Millwork Co., an order for 180,000 feet of No. 3 Common Green Douglas Fir Lumber. The lumber at the time was cargo aboard the steamship Cygnet bound from the Pacific Coast to Philadelphia. The ship arrived at the port of its destination on October 10, 1950, whereupon the lumber ordered by the defendant was unloaded and stacked at the pier of the Ontario Land Co., which notified the defendant of that fact.

On September 18, 1950, National Production Administrator Wm. H. Harrison, under the authority of the Defense Production Act of 1950, promulgated N.P.A. Regulation 1, which prohibited the storing or possessing of certain commodities beyond designated fluctuating quantities.

On October 16, 1950, the defendant notified the plaintiff that it could not accept the lumber because of the NPA regulation referred to, and accordingly asked for a cancellation of the order. The plaintiff refused to accept the cancellation and in due time sued on the contract of sale. The lower court entered a judgment in favor of the plaintiff, and the defendant appealed to this Court.

Section 10.8 (sub-section a) of the NPA regulation in dispute provides: "Outstanding orders, placed before the effective date of this part, for delivery earlier or in greater quantities than a person is permitted to receive, must be promptly cancelled, reduced or deferred to the extent that the original scheduled delivery would result in his exceeding his practicable minimum working inventory."

The defendant did not make a prompt cancellation of its order and it was not until one week following the arrival of the lumber that it notified the plaintiff of its intention not to accept it.

The lower court held, and properly so, that the sale of lumber was consummated on September 14, 1950, when the order was accepted, and that the title to the lumber passed on that date. This conclusion is reinforced by the fact that the price was fixed F.O.B. Dock, which signifies that the price was to include costs of transportation, back hauling, marine insurance and insurance against fire, theft, pilferage, breakage, non-delivery and oil damage. *Smith Co. v. Marano,* 267 Pa. 107, 110 A. 94. In that case, the Court emphasized the passage of title prior to arrival of the goods by pointing out that there would be no interest on the part of the purchaser to pay for transportation costs and insurance covering the goods in transit unless he were already the title owner thereof: " 'It is difficult to understand why the buyer should be concerned in any stipulation regarding payment of insurance, either by himself or by the seller, if he had no property in the goods during transit, and consequently no interest in the subject of their insurance. On the other hand, if he intended that they should pass to him as soon as they were delivered to the steamship the subject of insurance in transit would be vital to him. We think this reference to insurance in the contract of sales is controlling and significant of the intention of the parties.' "

The plaintiff contended in the court below that the defendant sought to cancel the order, not because of possible penalties for violating NPA regulations but because the price of lumber had plummeted after the order was placed. In support of this contention, the plaintiff produced witnesses who testified that between October 16, 1950, when prices in lumber were depressed, and January, 1951, when prices began to rise again, the defendant asked the plaintiff for a new price on the lumber, and in these attempted negotiations the defendant made no mention of the NPA regulation.

Interpretation 1 of NPA Regulation 1 (printed in 15 Federal Register 7763 Nov. 10, 1950.) states that "This section [10.8] thus does not confer an absolute right to cancellation of an order in any case, but offers to both parties the alternatives of reduction and deferment, thereby enabling the parties to hold to a minimum the interference with existing contracts. Consequently, since any adjustment of purchase orders which prevents accumulation of excessive inventories serves the purpose of the regulation, no particular form of adjustment is prescribed, but the matter is left to mutual agreement of the parties."

But the defendant did not avail himself of the method of prompt cancellation, reduction or deferment in accordance with the Regulation, all of which substantiates the plaintiff's argument that the defendant sought utilization of the Regulation only as a device to avoid potential losses resulting from a falling market.

Section 10.9 (a) of the Regulation provides that "Delivery may be made and accepted if the supplier has shipped the material or loaded it for shipment before receipt of the instruction to adjust". Here, the lumber was loaded, shipped, unloaded and segregated for defendant's account, invoiced and otherwise consigned to the defendant prior to receipt by plaintiff from defendant of any notice to adjust the order pursuant to the regulation.

The defendant failed to prove that acceptance of the lumber would have given it more than the "practicable minimum working inventory" permitted under the regulation. What is a practicable minimum working inventory depends on the correlation of sales to inventory. If sales in relation to inventory are low, there is an indication that the inventory might be excessive. If sales in relation to the inventory are high, then the inventory might not be excessive. A. Alan

Madway, partner and co-owner of the defendant company, admitted that no physical inventory figures were available but gave figures representing the dollar value of the defendant's inventory during the months of October, November and December, 1950, then added to these figures the dollar value of the defendant's order from plaintiff, and concluded that such addition would result in a 50% increase inventory for October, and a 100% increase for November and December. He offered no testimony to correlate the amount of sales to inventory.

In view of the defendant's continuing refusal to accept the lumber, the plaintiff resold it on January 4 and 9, 1951, for the total amount of $12,304.29, as against $16,912.01, the price agreed on with the plaintiff.

The defendant, in contesting the amount of the judgment entered in the court below, concedes that the proper measure of damages is the difference between the contract price of the lumber sold and its fair market value on resale plus incidental expenses incurred as the result of the breach of the contract, but maintains that the plaintiff acted imprudently and did not exercise reasonable care in reducing its loss, if any. The record shows that because of the decline in the market, plaintiff did not resell the lumber until the first part of January, 1951 when the prices took an upward trend again. The lumber was sold at $68, $69.50 and $70 per thousand feet, which prices were in excess of those received by plaintiff in other sales of the same type of lumber made at approximately the same time. In an attempt to show that the market value at the date of resale was higher than that received by plaintiff, defendant produced witnesses who testified that they made offers to the trade at prices ranging from $80 to $92 per thousand feet, but there was no testimony that any sales were made at such

prices. These prices apparently reflected what the witnesses must receive in order not to sustain a loss as a result of the slump in the market. Furthermore, the figures produced by defendant's witnesses were not, for the most part, based on dockside shipments which would be $3 to $5 less because of that fact. Plaintiff's resale of the lumber was timely and at prevailing market prices. It, therefore, was entitled to collect the difference in the price contracted for and the price received ($4,607.72), together with the charges for freight tax ($108.02), placing lumber in storage ($224.89), storage charges from October 1950 to February 1951, inclusive ($197.91), together with interest at 6% from October 16, 1950 ($308.31), or a total of $5,446.85.

Judgment affirmed.